24-2125 Salcido v. City of Las Vegas. May it please the court. We are here today because Crystal Cervantes died on November 8th 2020 and our belief is that her death was unnecessary. This is a unique circumstance in which the hostage situation that began when county defendants approached the house on Peggy Lane in Las Vegas, New Mexico was broadcast all over the place. It was broadcast on a Facebook live stream. The entirety of the hostage situation was captured on live stream but it didn't stop at the end of the live stream. The live stream lasted about 51 minutes. At the end of the live stream and kind of sort of an ongoing discussion between state defendants, crisis negotiation team, with sort of a triangulated conversation with the murderer, the guy in the house that killed Victor Cervantes and then eventually killed Crystal, Mr. Avides. There's this ongoing conversation that sort of continues the ability to see what's going on inside that house up to another probably 50 minutes. We've got a crisis negotiation conversation going on that is variably the fact that some of the data from that broadcast to officers on scene. What we have is police agencies and our position is that there is no interagency agreement. There is nothing explicit about who's supposed to take over this situation. We go back to statutory duty, statutory duty, not constitutional duty. Statutory duty for each of the police agencies to have taken independent action if necessary. We believe that the circumstances of what county defendants kind of started and the way we address that is that we believe that when the cousin... Well, can you address, I mean, I think you've got a precondition here on your danger creation theory and the precondition is you have to show some affirmative act on the part of officers and a violation of their administrative rules or statutory rules is not, or a failure to follow those, that's not an affirmative act. What was the affirmative act here? Well, our position, your honor, is that there was such glaring abdication on the parts of the respective defendants that it becomes an action. It becomes an affirmative act. What's the authority for that? That somehow the failure to act, no matter how glaring, becomes... Well, I agree that the, I mean, I have to concede the weight of the case law is not in favor of that position, but there are instances where... Is there any case law that favors that position in terms of the idea of it being an affirmative act, that first factor that the courts consider? We cite to Ross, which is an out-of-circuit case, I think comes from the Seventh Circuit, and that's the case where the sheriff, there's a drowning kid, sheriff shows up, kind of waves off some rescue efforts. There can be certain... So he waves off rescue efforts, which is an affirmative act. Right. What was there like that here? It's hard to discern that in the mess of the response in this case, quite frankly. So, I mean, the way that... Well, it's your job to tell us what it is. Well, it's... Our position, and I understand that it's seen as a novel position, is that the failure to act in the face of obvious danger can in and of itself become an action. There are times in tort law, for instance, that omissions are taken as negligence. We believe that sort of respective omissions, the collective omissions on the part of respective defendants here can amount to an action. But here, isn't the most difficult thing for you to overcome is that the danger was present before, very clear, an awful danger was present before there was any opportunity for the police to act. Is that a fair characterization? I think that it's fair to say that there was obviously some danger brewing. The way that it started was not a shots fired call. It was simply... It started out sort of as a justified welfare call. Mother gets a call from Crystal. Mother's not in town. If mother were in town, she would have driven straight over there. Instead, she calls her niece, who she asked to go over there. Her niece is apprehensive because of what she already knew about Albedez and his behavior from the day before, and just his general behavior. He's a dangerous guy. Luckily for her, she, on her way to the house on Peggy Lane, sees Deputy V. Hill. And so, it still hasn't crescendoed at all. If we had a crystal ball like we did after three o'clock in the afternoon into what was happening, I don't know what we would have seen. But we do know that there were no outward appearances of this kind of danger. And when I say this kind of danger, I mean the kind of danger that immediately erupts after Deputy V. Hill knocks on the door. And in the complaint, and in subsequent briefing in the district court, what I tried to make clear is that there's separate lapses on the part of the different defendants. The first lapse doesn't even occur with the way Deputy V. Hill and Deputy Atkins approach the house. The first lapse on the part of county defendants occurs in the way that they respond to the cousin coming up to the squad cars and saying, hey, there's this dangerous guy with a gun in the house a block away. They don't call it in for what it is, which is foreseeably a potential hostage situation. Armed guy, known criminal history, known mental illness history, two people in the house that aren't armed. The way that county defendants approached it started, well, didn't start it. It can be seen to have hastened the nature of the danger that happens after they get there. They knock on the door. Guns are not drawn. Squad cars are in front of the house. They show up in uniform. Deputy V. Hill declines backup from whoever dispatched, whichever dispatch she talked to. We believe it was actually state police dispatch. And from that point forward, Alvarez shoots. We hear the first shot that anybody in the universe heard, and we hear the scream. And from that point forward, it just gets incrementally worse. And the idea here is that because this stretched out for so long, it wasn't a quick, I mean, it was definitely a hostage situation. It was definitely something that justified that kind presence, obviously. But it became this very prolonged situation, which is where we get into asking the court to analyze this under the deliberate indifference standard, rather than the intent to harm standard on the conscious shocking behavior. So as I'm understanding you, the creation of the danger by the police officer was the way they responded to the initial request for assistance. They responded by going to the front door, ringing the bell that angered the gunman or excited him in some way. That's your claim of creation of danger? It has to be a creation of danger, does it not? Well, it has to be. It's either creation of danger or increased vulnerability to the plaintiff. And we've tried to emphasize that we're going on that theory, increased vulnerability. And so absolutely, it was plain as day that this was the kind of situation that you don't just treat as a welfare check. I mean, a welfare check is, my grandpa won't answer the phone, you know, he's older, maybe he fell down, can you go check on him? This is under New Mexico state law. This is not the circumstances that would describe a welfare check at all. What were they told by the sister? So it was the cousin they were told. My aunt called, she said that my cousin, Crystal, is home with Tuffy. Tuffy is Alitas' nickname. He's armed. He's acting irate. I believe she tells him he's been in the state hospital. He's got a violent criminal history. And she's recently talked to my aunt, Crystal's mother, and expressed fear that he's acting, or saying that he's acting crazy. And so these are circumstances that would justify a far different response from the initially responding agency. Certainly get over there, but certainly don't decline assistance. And that was offered by dispatch. And I think dispatch may have been one of the few sort of rational heads involved in that initial response, because dispatch saw that it was something that would require at least an invitation for backup. The two deputies just went over there as casual as day. And, you know, I don't know how much bearing this has, but we actually get to see what Alitas' response is to police knocking on the door. And granted, his ramblings are difficult to listen to in the Facebook live stream, but he says pretty quickly something to the effect of, after he shoots Crystal in the head, or right before he shoots Crystal in the head, your mom called the cops, or your mom's dumb, or there's some indication that his response to Deputy Vigil knocking on the door is the response we see within the first minute of him shooting Crystal in the head. I agree this case. It's difficult not to engage in a lot of speculation in terms of what would have happened if not for certain behavior. But that's kind of the nature of this case. Well, no, it's not the nature of the of the danger creation theory that you've alleged here. That is a very, very difficult theory to prove, and it requires affirmative action for a reason. Because if it didn't, we'd be doing what you're doing here, which is would have, could have, should have. These officers should have done this. These officers should have done that. It'd have been better if they'd done this. That's why we require, as a precondition, an affirmative action on the part of the officers that created the danger. And that's important here. No, I agree. I agree. We're here on an uphill battle. I don't disagree with the fact that the weight of the case law requires at least the suggestion of an affirmative action. But if we're left with circumstances where there is simply flat inaction, or there is simply flat scrambling with three different police agencies trying to find their heads and get some grasp on a situation that is at the same time evolving and fluid and emergent, but also giving you, it's an hour and 45 minutes, we think, if you take the CNT interactions before Crystal's finally dead, where we have state police officers there almost at four, almost four o'clock, potentially after four o'clock in the afternoon, positioning themselves behind the house with these long rifles, trying to get a shot, because their information from their commanding officer is that she's still alive. And so, yeah, it's, I'm getting... Well, and they're trying, they're trying to make sure other people aren't shot. Right. They're being cautious. They're not taking affirmative acts that caused this problem. They're being cautious. And so you have to factor that in. You can't just assume that, you know, with more officers there sooner, it would have made any difference. Well, but... They're plotting there all the way through. They're trying to decide what to do. I agree. They're getting the neighbors out there. You know, they're... I agree. ...setting everything up. Absolutely. There were other things that needed to be done. And I don't know, the idea that I've been suggesting that if you had a larger response of police officers, it would have satisfied our complaint is really... You'd have to have causation as well, you know? Well, yeah, that's what I'm trying to do too, is that if we are left to argue, if the precondition is that strict, that it will never account for situations where omissions are so great that they result in the breach of duty and causation. We're hobbled at the starting line. That brings me to an issue that I don't really was touched on in the briefing. But in your first opening comments, you talked about the officers' conduct also violated state law. Right. We've been spending all our time on the federal civil rights claim. Right. And as the Supreme Court has repeatedly said, the Constitution is not a fount of court law. But the state law is. Are you conceding that if you lose on the 1983 claim, the state law claim has to be dismissed as well? No, not at all. Have you made any argument along those lines? Well, I mean, there's this idea that we're suggesting that there's a time, place, and manner restriction that needs to happen with state claims. And that's not something that I've ever suggested. That's not something that I believe was ever raised in any of our briefing below. And the response, assuming that there's a suggestion that there's a time, place, and manner, and I've never suggested to replace my own theory on how this should have been handled for what actually happened. I'm not sure I'm following you when you speak of time, place, and manner. My question is rather straightforward. Ordinarily, this court says, if a district court disposes of a federal law claim before trial, then the state law claims should be dismissed without prejudice and left to the state court. The one circumstance in which that wouldn't make sense if it's the same claim, essentially, if you're suing under the clear equivalent of a 1983 claim. And I'm curious why that doesn't seem to have happened here. And it's hard for you to do that because you don't know that's the situation until the court rules. But the court disposed of the state law and federal claims at the same time. But should the court have dismissed state law claims without prejudice at this point? And I'm not sure we should address that when you haven't raised it. But I'm curious why that wasn't presented to the federal district court. I'm not sure quite how to answer that. I mean, there's completely separate theories. To answer the court's question, if you don't, did you argue in your brief that even if we lose on the federal law claims, we have state law claims? I asked the court to reverse the finding of summary judgment on state law claims. And there are distinct theories. You did base that in your briefing here? I believe I did. I'd like to think I did. OK. Well, your time's expired. OK. Thank you, Your Honor. We'll hear from the appellees. What you've asked for never works. Divide your time between three attorneys when it's just 15 minutes. I'm not sure that there's something they'll want to add after you're done. And I don't know how you've tried to work this out. But just know you may be up there for the whole 15 minutes. Understood, Your Honor. I'm ready to speak quickly. OK. May it please the court, counsel, Nick Adio here on behalf of San Miguel County appellees. This case is undoubtedly tragic. Crystal Cervantes was murdered by Alejandro Allirez, a private actor. This case is founded on a private act of violence. Unfortunately, after Mr. Allirez shot Mr. Cervantes twice within a period of roughly three minutes, Mr. Allirez spent the next 30 minutes firing gunshots out of the front of the residence at law enforcement that was responding, preventing them from having the opportunity to save Mr. Cervantes. The question before the court is whether Mr. Cervantes' substantive due process rights were violated. The court in Descheny made it clear that the state does not have an affirmative obligation to prevent or to protect against private acts of violence. And to address a few questions that came up regarding affirmative action in this case, the Tenth Circuit has repeatedly reiterated the fact that inaction, even inaction by the state when there is a known danger, does not trigger an affirmative obligation to act under the 14th Amendment to prevent a private act of violence. Of course, there are two exceptions. There are the special relationship doctrine. I'm not going to spend time on that because that was not brought up in the briefs. But what we're really the core of the argument here is the danger creation theory. I think it is very helpful in this case to compare a few Tenth Circuit cases. In TD versus Patton and Currier, in addition to Armijo, those are cases where the Tenth Circuit found that a danger was created by the state. In those cases, the state was aware of a danger posed to children, and despite being aware of that danger, placed children in a situation where they suffered harm, they suffered abuse. The court, rightfully so, found that there was danger creation in those cases. Compare those two cases to Bryson and Christensen. In Bryson, you had a postal worker that unfortunately began shooting within a postal office. Law enforcement responded it was a hostage situation that did not resolve for over an hour and a half. In that case, the Tenth Circuit did not find that the state had created the danger because that danger preexisted them arriving. It was that homicidal ideation and actions by the postal worker that created the danger, not any state action. In Christensen, where the court was faced with a similar, albeit different, situation where Christensen was armed with an AK-47 rifle. He, at that time, was threatening suicide. Officers responded. They were on scene for hours while he was barricaded in his residence, and eventually they fired a baton round through a rear window, broke the window, and shortly thereafter, Mr. Christensen took his own life with that rifle. Once again, in that case, the Tenth Circuit found that the state did not create that danger. His suicidal ideation preexisted the state arriving, and they did not create that danger. Those cases, both Bryson and Christensen, are very instructive in this case because Mr. Allirez's homicidal ideation preexisted law enforcement arriving. Law enforcement did not cause him to have those homicidal thoughts and homicidal actions. Before you move from that, can I just ask you, I think what your opposing counsel is arguing, though, is that, yes, there was a danger, but by coming and knocking on the door like a welfare check, they escalated that and increased the danger because the man became agitated at that point. Can you respond to that theory? Absolutely, Your Honor. So first, I believe, and that's where Christensen's really instructive because in that case, it was the claimant was very focused on the baton round being fired through the window, and that's what caused him to take his own life. The court rejected that. The Tenth Circuit rejected that as creating the danger, and in this case, the deputies, yes, they arrived to do a welfare check, and they knocked on the door, and then at that point, they heard a gunshot and a scream, and then the deputies backed off and began taking gunfire from Mr. Elirez. So that knocking on the door, certainly in Christensen, if an affirmative act by law enforcement of firing a baton round through a window did not amount to create a danger, which caused him to kill himself, I would argue that in this case, the act of simply knocking on the door certainly could not amount to a danger, creating a danger that resulted in him taking life of Ms. Cervantes. Also, it's difficult to understand what law enforcement should have done. They were asked to perform a welfare check. There's very little they can do. If knocking on the door is what created this danger, what could law enforcement have done in that situation to avoid creating a danger? Really, the only option I can see is them not responding at all. If they'd responded in force with a tactical team, helicopters, and started barking orders over a PA system, to me, that's creating even more of a situation than simply knocking on the door. The only thing I heard from Plaintiff's counsel is that one affirmative possible act was that they refused any assistance, at least early on, before they walked in. And Your Honor, I believe that's because this is general law enforcement work. It's not at all rare for law enforcement to, on a daily basis, they have to go conduct welfare checks. They cannot devote a significant amount of their manpower to every welfare call they get, because they wouldn't be able to police the community in that situation, Your Honor. So it was appropriate at that point, because this was just a welfare check until they heard the gunshot. I stand ready for questions, but I want to respect my colleagues' time. Let me ask you a question, then I'll go to all of you. But you've only dealt with the 1983 claim. Yes. What about the state law claim? That could have very different standards. Yeah, so there is— Maybe it doesn't under state law, I don't know. There is the state law claim. Plaintiff has alleged that we failed to investigate under 2911 of New Mexico law, and also that there was negligence resulting in battery under 41412. I believe that the court correctly dismissed those claims with prejudice, because there is no— Wasn't it summary judgment? Yes, I'm sorry. It was summary judgment. Yeah, that's different. Yeah. Yes. And I believe that was correct, Your Honor, because in New Mexico there is no time, place, and manner restrictions in terms of how to actually conduct an investigation. Of course, you know, in this case— Aside from the merits, don't we let the state courts handle that? We have a number of cases, I'm not sure they're unanimous this way, but there are a number of presidential opinions of this court directing district courts, after disposing of federal claims before trial, to then dismiss the state law claims, let them go to state court. Why was that not done here? I don't know why that was not done here, Your Honor. It was—the state law claims were also dismissed with prejudice in this case, Your Honor. They were—summary judgment was granted after discovery. There's a difference. Summary judgment was granted on those claims. In New Mexico, we call that a dismissal. Sorry. I stand ready for any questions. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors, and may it please the Court. I'm happy to dive into my— Ms. Graham, right? I'm sorry? Ms. Grant. Yes. Haley Grant on behalf of city defendants, including the Las Vegas Police Department. Mr. Alitas brutally and sensibly shot and killed both Victor and Crystal Cervantes, but for the Las Vegas Police Department's part, they did not respond until after Alitas had already killed Mr. Cervantes, and, of course, after Ms. Cervantes had suffered a fatal gunshot wound to the face. Of course, the police department could not have caused or increased the danger because those fatal gunshots had already happened. Plaintiff has not offered any proof in the record, as would have been in a case like the district court decision in Sanders, the Columbine High School case, where there was medical evidence that a teacher who was shot could have actually survived another three hours, had the SWAT team and incident command not prevented people from going into the school and also prevented others from leaving. We don't have anything like that here, and unlike the wound there, this was a clearly fatal—a fatal wound. Beyond that, realistically speaking, there was—all the officers that responded that they did the absolute best that they could to facilitate a rescue without recklessly endangering their own lives, the lives of neighbors in the area, and even hastening the death of Ms. Cervantes herself. Well, Counselor, you've moved on from your first point, but I just quickly want to ask this question. So are you making a slightly different argument, I guess, than your colleague, which is there's just no causation here? Yes, Judge Ide, and the lack of causation actually pertains to both the Section 1983 due process claim as well as the state court claims, and that way those two claims are similar. They both require a duty and a proximate cause, and so even without having to dig into the details of the state claims, it resolves everything just for lack of that proximate cause. Did the district court rule on causation? Yes, Your Honor. I believe that they did, that the court did. Well, that might have preclusive effect on the state law claim, which would make a dismissal without prejudice to go to state court futile. They ruled on merits. There was a ruling on the merits on that? Yes, Your Honor, that was, and the reason for that was because city defendants still should say that the city still had a pending municipal liability claim that kept, that was not moved for until later after the court had already entered its decision. So because that federal claim still existed, it maintained jurisdiction so that the district court could not exercise, dismiss the case under the theory that they should generally dismiss state claims when they have supplemental jurisdiction. And in terms of causation, that applies to all the defendants? Or is it that your clients came later, so it was clear that she had been fatally wounded by that time? No, Your Honor, and I think that's a really important point to make that the state is not arguing that any of the officers caused the harm. They're arguing that we should have prevented the consequences of a harm for gunshots that we did not provoke. Responding to a welfare check is a perfectly legitimate police action. It's something that Bryson recognized in part because, just because officers that surrounded the post office did not trigger some affirmative duty to protect. Because otherwise, you would have to apply that in every situation where officers ever responded to private violence. And as I believe it was the Sanders court recognized, this would effectively paralyze the function of a police department. So it's because, especially just looking at the shocking, the conscience factor in terms of the restraint that courts must have in interpreting due process, it would make no sense to rule that there's this affirmative obligation rather than an affirmative duty to avoid creating the danger. So essentially what the state is arguing inverts the substantive danger creation due process obligation. And it also does it for police officers where they are in a situation, as in the Perez case, in which they're operating under very rapidly evolving, intense circumstances where there's a lethal threat. And in those kinds of circumstances, there's no time for unhurried judgments or the kind of calm and reflective deliberation that you would need to apply deliberate indifference. And so just recognizing these circumstances, the Rice and Court, and even the Christians in court, has cautioned against any kind of an expansion that would hamstring law enforcement. It's also worth mentioning that in Christiansen v. City of Tulsa, officers did what the state seems to be suggesting should have been done here. They engaged with force, but the result was the exact thing that they sought to prevent. There, it was a suicide. Here, it would have been additional gunshots and potential other murders. So it was very important that law enforcement be allowed to make the tactical decisions that they have on scene with the expertise that they have rather than this after the fact, charting them with injurious consequences that even the Satter's Court recognized would, like I said, paralyze the function of law enforcement. Are you, do you want to leave any time for Mr. Robles? Yes, I'm sorry. He doesn't want to take any time. But, and I think Mr. Nieto went over a minute or two, did he? Yeah, so if that's, yeah. Please. Okay. May it please the court, my name is Luis Robles and I... We'll give you two minutes. I think that will make it up to time even, yeah. So two minutes. Can you say anything in two minutes? Yes, I can. And it's to answer the question of proximate cause and why it matters so much here and to give you more detail about how you can resolve this. There are two videos that would be very helpful for you to review. There's the Facebook video in which the suspect, Mr. Alivez, you know, videoed himself conducting the murder. And then there's the police officer, Deputy Vigil's body-worn camera. And when you put them together, what you realize is that before the deputy showed up, Mr. Alivez shot Ms. Cervantes in the abdomen. This is before the police ever show up. And then subsequently, when the deputies are at the door, there's a knock. And then you can watch it on the Facebook video. 30 seconds later, you do not hear Mr. Alivez react to the knock. He's focused on Ms. Cervantes and says things that are despicable and mean and cruel. And then he shoots her in the head. And that's the first shot that you hear on Deputy Vigil's body-worn camera. So we know that before, especially for my clients who were unaware of any of this happening because they were out on patrol doing other things, that the fatal shot was delivered before the officers took any real action. And it wasn't because of a knock on the door. It's because of, unfortunately, Mr. Alivez's mental illness, his psychotic nature that caused this injury. And to say about the state law claim, there's also this problem. Even if you can see that our clients were negligent, the battery happened before the negligence. So there is no negligent causation of battery. And in terms of negligent investigation, the death, the fatal wound was delivered before you even had an investigation. That's why proximate cause matters in this particular case. Did the district court rule on the proximate cause? The motion that state defendants filed brought up the issue of proximate cause. And Chief Judge Gonzales, in the memorandum opinion and order for my argument, did say that there was no proximate cause for the state law claims. Against the state police. State police. But didn't say lack of proximate cause with respect to the claims against the other defendants? Well, I know the order. And another unfortunate thing about how this matter was resolved, it might answer the question about supplemental jurisdiction. Right out of the gate, I filed my motion for summary judgment. The city filed theirs months later, almost a year later. Not to disparage Mr. Arion anyway, but he didn't enter the case until late. He didn't file his motion for summary judgment until some time after. So Judge Gonzales was faced, when my motion was ruled upon, that he had to decide the claims I brought with these pending 1983 claims still hanging in the air. So I can understand how Judge Gonzales ended up deciding the state law claims and not declining supplemental jurisdiction. And I understood, Your Honor, you had a question. No, please. I was just going to ask, how do we know that the shot to the abdomen was the cause of death? No, the shot to the abdomen was not the cause of the death. And that had attached the Office of the Medical Examiner's report that says as much. And the fatal shot was the shot to the head. And that was the one that was delivered when the deputies were knocking on the door. Well, their argument, though, isn't it that it wasn't fatal immediately and that had there been something done here, a better investigation or some action on the part of the officers that they could have gotten in there and given her care? Because you can hear Crystal breathing on the video for some time. And so it's not about the shot itself. It's about the inability to get to her and render care while she continues to live. It wasn't immediately fatal. All of that is true. And it is tragic and it is unfortunate. And maybe the best way to answer your question is taking the estate's claim head on. There was this expectation by the estate that this group of deputies and officers, you know, who've never really worked together to clear a house, should somehow form together an entry team and that they should engage in a dynamic entry, confront a man who was mentally ill, had a gun, had already shot at them. And of course, the likely outcome of that would have been an officer-involved shooting. And if you look at this 10th Circuit case law on the Fourth Amendment, it's instructive that given these factors and you look at recklessness, as this court has identified in 12 use of deadly force cases, you begin to realize, wouldn't that have been reckless? You know, you think about Sevier and you think about Allen versus Seedy Muskegee, you have someone who's mentally ill and that weighs against confronting them. You realize, getting two minutes, you're close to six now. I apologize for going on. You could finish your last thought, but very briefly. And maybe you completed that thought. Put a point on it. The Fourth Amendment case law, this court's 10th Amendment, the 10th Amendment or Fourth Amendment case law says that this is that if those officers had done what the estate wanted, it would have been arguably reckless. Thank you. Thank you. OK, Mr. Nieto, these cases get out of hand with all these defense counsel. Do you wish to respond in any way? OK, thank you. Thank you, counsel. Cases submitted. Counsel are excused.